UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Philadelphia Vietnam Veterans Memorial Society** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | **Civil Action No. 20-cv-05418** |
| **JAMES KENNEY**, in his official capacity as Mayor of the City of Philadelphia; **TUMAR ALEXANDER** in his official capacity as Acting Managing Director of the City of Philadelphia | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFF'S
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

I.     INTRODUCTION

Pursuant to 28 U.S.C. § 517, the United States respectfully submits this Statement of Interest

supporting Plaintiff's Complaint for Declaratory Judgment and Injunctive Relief, filed October

30, 2020. ECF No. 1.[1]

---

[1]The United States regularly files statements of interest and amicus briefs on important issues of fundamental rights in courts at every level, from trial courts to the Supreme Court of the United States. Section 517, in its entirety, provides: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517. Section 517 provides clear statutory authority for the United States, in its discretion, to

This is a case about more speech, not less. It is also a case about Philadelphia's double standard whereby it treats some types of speech (unpermitted protests) much more favorably than others (permitted parades and other expressive gatherings). There is no possible public health justification for this double standard. The City's policy of banning parades and other expressive gatherings fails as a matter of constitutional law and basic common sense. Critically, the solution to eliminating this double standard is not to discourage or limit protests–two wrongs do not make a right. Instead, the solution is to allow *all* speakers to express themselves in accordance with their constitutional rights. The City's illogical and unconstitutional ban on parades and other expressive gatherings should be eliminated. Again, more speech is the answer, not less.

The United States is committed to protecting the freedoms guaranteed by the First Amendment, which lie at the heart of a free society and are the "effectual guardian of every other right." James Madison, Virginia Resolutions (Dec. 21, 1798), 5 The Founders' Constitution, 135, 136 (Philip B. Kurland & Ralph Lerner eds., 1987). In the midst of the COVID-19 pandemic, the United States has a strong interest in the development and maintenance of public health policies that protect citizens from harm while still respecting their First Amendment rights, including the peaceful exercise of the freedom of speech, freedom to assemble, and freedom to petition the government on matters of public importance in a traditional public forum.

---

attend to its interests in any court or proceeding to which it is not a party. The United States has a long history of using this authority in private suits, filing over 600 statements of interest since 1925. Victor Zapana, Note, The Statement of Interest as a Tool in Federal Civil Rights Enforcement," 52 Harv. C.R.–C.L. L. Rev. 227, 228-29 (2017).

The City of Philadelphia has announced an "Event Moratorium," imposing a blanket ban on issuing permits for any large public gathering–initially of more than 50 people, subsequently increased to 150 people. While the City has allowed unpermitted demonstrations to occur, it has banned certain types of protected public gatherings, such as parades. *Hurley et al v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) (unanimously holding that parades are protected First Amendment activity). Parades come in many shapes and sizes, with myriad messages. Some are groups not much larger than 150 people and seek to express solemn messages. And, by their nature, parades almost always necessitate street closures and other safety measures, therefore requiring coordination and planning with the City through a permitting process. To hold a parade without coordination with the City is to invite disruption, or even harm.

The demonstrations that ensued after George Floyd's death have shown the enduring importance of the First Amendment and the rights to free speech and free assembly. But those rights apply to all forms of speech and assembly; it is unconstitutional for the Philadelphia municipal government to shut down certain types of speech, while allowing other types of speech to proceed unchecked. More to the point, the City allows (and even encourages) large protests, but not parades or other expressive gatherings. This raises the specter of viewpoint discrimination – that the City is favoring certain kinds of speech because of its message.

Thus, while Philadelphia officials continue to bless unpermitted protests, the City has stated that it will deny a permit to groups seeking to engage in other forms of First Amendment-protected activity. The supposed reason for the blanket permitting ban is to prevent the spread of COVID-19 by eliminating large outdoor gatherings. By contrast, for those willing to take to the

streets without a permit, a group of *any* size can do so – even if that group eschews social distancing, masking, or any other CDC guideline. This is true even though the same concerns about virus transmission would obviously apply with equal force to both situations. The City's disparate treatment (and double standard) is illogical, favors particular speakers and issues, does not serve public health purposes, and is unconstitutional.

Indeed, the Supreme Court has often struck down ordinances where the distinction between two types of speech or expression is unrelated, or only tangentially related, to the government's asserted interest. This is so especially where a less blunt approach could achieve the same ends. In short, if the City's concern is that a large parade could cause an increase in transmission of COVID-19, a blanket ban for groups over 150 is not narrowly tailored to serve that interest, especially while also allowing other large gatherings to take place without permits. Moreover, when contrasted with the City's recent decision to allow gatherings of up to 7,500 people in outdoor venues (including for Eagles games),[2] the Event Moratorium is all the more unjustified. Rather than a blanket ban, the Constitution requires a narrowly tailored approach that might, for example, allow event organizers an opportunity to demonstrate appropriate safety measures.

---

[2] "Philly increases crowd size limits, allowing fans at Eagles games," available at https://www.inquirer.com/ news/philadelphia-coronavirus-covid-restrictions-eagles-lincoln-financial-field-20201013.html

## II.    BACKGROUND[3]

### A.  The Event Moratorium

On July 14, 2020, due to the ongoing COVID-19 public health crisis, the City of

Philadelphia ("the City") issued an "Event Moratorium" stating that the City "will not accept,

review, process, or approve applications, issue permits, or enter into agreements for special

events or public gatherings of 50 or more people on public property through February 28, 2021."

*See* July 14, 2020 Press Release, attached as Exhibit A to PVV Compl.[4]

At Philadelphia Mayor Jim Kenney's July 14, 2020 press conference announcing the

Event Moratorium, then-Managing Director of the City of Philadelphia, Brian Abernathy,

advised that the Event Moratorium would apply to those event organizers who follow the usual

permitting process: "[w]hen we look at events, most of those are planned well in advance—

months in advance—and they work with our Office of Special Events in order to do that. Those

are the events that we are talking about."[5]

This chilling effect of the Event Moratorium is evident and is set forth in the plaintiff's

Complaint. For example, each September 11, Philadelphia and other communities throughout the

country commemorate the 9/11 terrorist attacks on our country, taking time to mourn the victims,

---

[3] For purposes of this brief, the United States assumes the truth of the facts alleged in the Plaintiff's Complaint for Declaratory Judgment and Injunctive Relief. It also relies on publicly available information and, similarly, assumes the truth of those materials at this stage in the proceeding.

[4] On September 15, 2020, the City issued a subsequent order expanding the number of people at public gatherings to 150 or more. "Fourth Amendment Regarding Activities Permitted Under the Emergency Order," at https://www.phila.gov/media/20200916093737/Order-9-15.pdf. It continues its Event Moratorium and will not consider any special event permits.

[5] *See* Mayor's Press Conference, https://www.youtube.com/watch?v=6vtzHF-KwTQ&list =PLjOjrf1VwmXfmqIGbTZF69BnclnljP28u&index=68&t=0s.

honor the heroism of first responders, and remember a time when citizens stood united in support of America and against those who would do our country harm. PVV Compl. ¶¶ 28-29. Yet, public 9/11 commemorations were muted in Philadelphia in 2020. *Id*. Countless other activities have or will be canceled, such as the annual Philadelphia Puerto Rican Day parade, the German-American Steuben Parade, the Polish-American Pulaski Day Parade, the Ethiopian Day Parade and Festival, OutFest, the Southwest Philadelphia Pride Day Parade, the Nicetown Give Back Festival & Parade, the Philadelphia Veterans Day parade, the South 9th Street Italian Market Festival, the Thanksgiving Day Parade, and the New Year's Day Parade. By closing the permitting process, the City has also denied event organizers the opportunity to determine in advance whether a planned activity will be deemed exempt from the Event Moratorium or a violation of the law. *Id.* ¶¶ 28-29.

### B.  Large Public Demonstrations Allowed

Following the Event Moratorium, the City has routinely allowed large public demonstrations, despite the fact that most of these events far exceeded the capacity limitations outlined in the Event Moratorium.[6] For example, large crowds gathered all summer around City Hall and various public properties to protest the killing of George Floyd in Minneapolis. The City also allowed large crowds to assemble in a semi-permanent "tent city" encampment along

---

[6] More information about planned protests can be found on www.phillyprotest.com, a site not affiliated with the City, and also through the City's "Alert Philadelphia" notifications (*see* https://centercityphila.org/ccd-services/public-safety/crime-prevention). As is evident from these sources, the various protests are planned, scheduled and announced in advance – sometimes even occurring at a regularly scheduled time every week. They are not spontaneous.

the Benjamin Franklin Parkway.[7] In late August, large crowds again gathered throughout the City to protest the shooting of Jacob Blake in Wisconsin.[8] Recently, large crowds were permitted to gather around the National Constitution Center to protest a town hall meeting held by President Donald Trump.[9]

Mayor Kenney has expressed support for these large protests. For example, on July 8, 2020, he waived all code violation notices for people who protested in large groups during the month of June 2020.[10] On July 16, 2020, he announced that the City would postpone closing the large downtown encampments, adding, "[t]his demonstration activity casts an important light on the racial inequities in our society that impact homelessness and frankly have informed inadequate solutions."[11]

While the City's stated rationale in imposing the Event Moratorium is to stop the spread of the virus, the City has downplayed the idea that large protests have led to a spread in COVID-19. Indeed, Philadelphia Health Commissioner Dr. Thomas Farley has expressed skepticism that

---

[7] "How Philly's Summer of Protests Revitalized the Affordable Housing Movement," (Philadelphia Inquirer Sept. 15, 2020) available at https://www.inquirer.com/news/philadelphia/philadelphia-homeless-encampments-black-lives-matter-housing-justice-20200915.html.

[8] "Protest held in Philadelphia for Jacob Blake who was shot by police in Wisconsin," (Aug. 27, 2020) available at https://6abc.com/jacob-blake-shooting-philadelphia-protest-philly-bideo/6390453/

[9] *See* "Trump town hall in Philadelphia prompts protests near National Constitution Center, march through Center City," (Philadelphia Inquirer Sept. 15, 2020) available at https://www.inquirer.com/news/trump-visit-town-hall-philadelphia-national-constitution-center-protest-20200915.html.

[10] *See* "Mayor Kenney waives code violation notices for recent Philly protests," at https://whyy.org/articles/mayor-kenney-waives-code-violation-notices-for-recent-philly-protests/.

[11] *See* "City Provides Update on Protest Camp," at https://www.phila.gov/2020-07-16-city-provides-update-on-protest-camp/.

the initial wave of protests caused an increase in the incidence of the virus, stating "I can say that if (the protests) were to cause a substantial increase in the spread, I would have expected an increase earlier."[12] He continued, "I don't believe the protest had a big impact, but I'm not sure and we'll ever know." *Id*. To date, the United States is unaware of any City official discouraging the protests from occurring, based on worries about the spread of the virus.

### C.  The Philadelphia Vietnam Veterans Memorial Society

The Philadelphia Vietnam Veterans Memorial Society ("PVV") is an organization of veterans that exists to promote, honor, and dignify the memory of all military veterans who served in Vietnam. PVV Compl. ¶¶ 13-17. Among other things, PVV fulfills this mission by providing honor guards and rifle teams to attend veteran burial details and by participating in parades and other public events. *Id*. PVV's funding comes primarily from charitable donations generated through PVV's participation in public events and fundraisers that the organization holds throughout the year. *Id*. ¶¶ 1, 16. In its Complaint, PVV states that as a direct result of the Event Moratorium, it is prohibited from holding or participating in many of the public events that support its mission. *Id*. at ¶ 17.

On September 18, 2020, the City wrote to PVV. While it refused to issue a permit to PVV for any activity, it stated that, should PVV hold a parade, the City would not forcibly disperse it. *Id*. ¶ 53. However, the City did not coordinate with PVV via the permit processing to ensure that City resources could be adequately deployed. *Id*. ¶ 56. In fact, the City explicitly declined any such resources, stating "[n]or can the City devote significant resources related to

---

[12] *See* "Did protests impact Philly's COVID-19 case increase? Dr. Farley explains," at https://6abc.com/philly-protest-covid19-covid-19-testing/6285761/.

the planning of large-scale events[.]" *See* Exhibit C to PVV Complaint, Sept. 18, 2020 Letter

from City to PVV. And, left unsaid was that PVV would still violate the Event Moratorium by

holding a parade or other gathering. *Id.* ¶¶ 53-56. This failure to engage with PVV stands in stark

contrast with recent protests, where Mayor Kenney has planned for and devoted significant

municipal resources and policemen for "potential protest activity and large crowds."[13]

### D.  September 21, 2020 Supplemental Order

In its September 18, 2020 response to PVV, the City also advised that it would be issuing

a revised order regarding outdoor gatherings. On September 21, 2020, the City issued a

"Supplemental Order Regarding Application of the Emergency Order Allowing Limited

Reopening of Businesses, Advising Philadelphians that They are Safer at Home, and

Establishing Safety Measures to Prevent the Spread of 2019 Novel Corona Virus (COVID-19)."

*See* Exhibit D to PVV Compl. The supplemental order provides that the City "will not be

evaluating applications for special events or demonstration permits for the duration of this Order

and any subsequent renewals." *Id*. The supplemental order further states that the City will not be

enforcing permitting requirements for gatherings of 150 people or less; however, "[a]ll other

permitting and licensing requirements must be followed." *Id*. The City also changed its eight-

month moratorium date and stated that the supplemental order would remain in effect for 30

days, renewable based on evidence-based recommendations of the Department of Health. *Id*.

Thus, since July 14, 2020, the City has not accepted any permit applications or granted

any permits, including for any of the protests and demonstrations described above. *See* PVV

---

[13] *See* "City Plans for Potential Protests Following Grand Jury Decision in the Breonna Taylor Case," at https://www.phila.gov/2020-09-23-city-plans-for-potential-protests-following-grand-jury-decision-in-the-breonna-taylor-case/.

Compl., Ex. C., Sept. 18, 2020 Letter from City to PVV ("We are not currently granting permits for any protests, parades, demonstrations, festivals, etc. We did not grant any permits for the recent racial justice protests, or for any other recent spontaneous demonstrations.").

### E. Philadelphia Is Now Allowing Gatherings of Up to 7,500 People in Outdoor Venues, But Did Not Change Its Event Moratorium

Starting on October 16, 2020, the City now allows gatherings of up to 7,500 in outdoor venues, including for Eagles games.[14] Mayor Kenney has stated that the City's decision was based on evidence that the virus does not spread as easily outside as it does indoors.[15] Despite this rationale, which of course would apply equally to parades and other expressive gatherings, the City has not lifted the Event Moratorium.

## III.   ARGUMENT

Expressive activity by groups like PVV is protected by the First Amendment. Even during a pandemic, government restrictions on such activity must actually serve the City's interest in reducing transmission of the virus. As discussed below, the City's Event Moratorium does not deserve deference described under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Rather, this Court should find that upon proper application of First Amendment principles, the City's actions potentially implicate viewpoint discrimination; and, even if the Moratorium Order were deemed content neutral, it still is not a legitimate time, place, and manner regulation. Indeed, the manner in which the City has allowed large demonstrations to proceed eviscerates its supposed public heath rationale for the Event Moratorium.

---

[14] "Philly increases crowd size limits, allowing fans at Eagles games," available at https://www.inquirer.com/ news/philadelphia-coronavirus-covid-restrictions-eagles-lincoln-financial-field-20201013.html
[15] *Id.*

### A.  There Is No Pandemic Exception to the Constitution

The First Amendment, which is incorporated against the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I; *see Lovell* v. *City of Griffin*, 303 U.S. 444, 450 (1938). "The values embodied in the [F]irst [A]mendment . . . constitut[e] the hallmark of free societies." *Monterey Cty. Democratic Cent. Comm.* v. *United States Postal Serv.*, 812 F.2d 1194, 1196 (9th Cir. 1987).

The United States Constitution and its Bill of Rights protect us at all times. These protections are especially important during times of public health crisis, such as the current COVID-19 pandemic, when the federal government and states have taken unprecedented steps to contain the spread of the novel coronavirus.

It is true that the Constitution generally provides for some deference to necessary, temporary measures taken by the government to meet a genuine health emergency. The Supreme Court took up this issue over 100 years ago in *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905). As to government restrictions during a public health emergency, the Court stated that, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* at 29.

That deference is not absolute, however. A state may not simply invoke a public health emergency and ban all individuals from exercising the very rights they use to hold those officials

accountable. To the contrary, the Supreme Court has "repeatedly" admonished that "laws which actually affect the exercise of these vital rights cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967) (citing cases).

And, as Justice Alito recently noted, the calculus likely changes even further when the government's actions during a public health emergency not only implicate fundamental constitutional rights but are also widespread and long-lasting. *See, e.g., Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (Alito, J., dissenting from denial of injunctive relief) ("[I]t is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox. It is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case."). Furthermore, "[a]t the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify— public officials may not be able to craft precisely tailored rules," and so "at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules," but "a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists." *Id*. at 2605. In such cases, the government's actions should generally satisfy the same legal tests used outside of public health emergencies – *e.g.*, restrictions on First Amendment activities must "withstand strict scrutiny" just as in any other case involving First Amendment restrictions, *id*. at

2608 – although the government's competing interests admittedly may be greater than during a non-emergency.

Recently, on October 9, 2020, another federal court recognized the foregoing limitations on the *Jacobson* framework. First, it noted the "unique array of claims before the *Jacobson* Court—such as that the regulation violated the preamble and spirit of the Constitution— including none under the First Amendment." *Capitol Hill Baptist Church v. Bowser*, No. 1:20-cv-027210, 2020 WL 5995126, at *7 (D.D.C. Oct. 9, 2020). Second, acknowledging that *Jacobson* "leav[es] room for an energetic response by the political branches to the many uncertainties accompanying the onset of a public health crisis," nevertheless "when a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out." *Id.*; *cf. Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) (per curiam) ("While the law may take periodic naps during a pandemic, we will not let it sleep through one.")

Although the precise legal tests may change based on the specific restriction at issue, the bottom line remains the same: there is no pandemic exception to the Constitution and our fundamental rights. Individual rights set forth in the Constitution are always operative and restrain government action. Thus, *Jacobson* does not require judicial abdication with respect to Philadelphia's public health directives that impinge on the exercise of core First Amendment rights. Rather, the Court in *Jacobson* stressed that "no [emergency health] rule prescribed by a state . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument[.]" 197 U.S. at 25. The government's actions should generally, therefore, satisfy the same legal tests used outside of public health emergencies, *i.e.*, restrictions

on First Amendment activities must withstand ordinary constitutional scrutiny, just as in any other case involving First Amendment restrictions. *Butler v. Wolf*, 2020 WL 5510690, at *5-10 (W.D. Pa. Sept. 14, 2020). Recent decisions by federal district courts in Pennsylvania and New York have adopted this rationale when striking down state-wide restrictions on the freedom of assembly. *See id.*; *Soos v. Cuomo,* 2020 WL 3488742, at **7-12 (W.D.N.Y. June 26, 2020); *cf. Capitol Hill Baptist Church,* 2020 WL 5995126, at *8-10.

In short, while local governments have broad authority to protect the public during public health crises like the COVID-19 pandemic, a municipality does not have *carte blanche* to ban peaceful public parades and other events that require permits – especially while allowing other forms of First Amendment activity to take place with no restrictions at all. Nor may a municipality favor certain views and forms of First Amendment expression (*i.e.,* certain protest activity) over others (here, expressive speech and association by veterans).

### B. The Enforcement of the City's Event Moratorium Raises Significant Viewpoint Discrimination Concerns.

One of the most basic protections of the Free Speech Clause is that the government may not as a general matter privilege certain speech which it favors and restrict other speech that it does not. *See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (invalidating exclusion of church's religious speech from forum and explaining that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *United States v. Armstrong*, 517 U.S. 456, 463-468 (1996) (addressed selective enforcement); *see also Widmar v. Vincent*, 454 U.S. 264, 269 n.6 (1981) (holding that exclusion of religious worship from speech forum was impermissible

discrimination, and rejecting argument that "religious worship" is "not speech protected by" the First Amendment, but instead is an "act" undeserving of First Amendment protection).

Accordingly, the court must consider whether the City's COVID-19 limitations are being enforced in a viewpoint-neutral way. Our country's response to recent events has shown the importance of peaceful protests to maintaining our civil fabric. Across the country, many thousands of people have gathered to express their views on a wide range of topics, including social justice matters of national significance. But speech the government deems important and socially beneficial cannot under the First Amendment be used as a basis for allowing certain speakers and barring others.

Here, as noted above, the City and Mayor Kenney have encouraged and allowed large-scale political protests in support of a variety of causes, including those regarding the shooting of Jacob Blake and the death of George Floyd. The City has also waived code violations and in so doing provided a justification based on the viewpoint expressed. In the words of Mayor Kenney: "[I]n waiving these notices, I recognize . . . *their message*—Black lives matter—*needs to be heard* every day until systemic racism is fully eradicated from this city and nation."[16]

Plainly, the First Amendment "forbids the government [in Philadelphia] to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel*, 508 U.S. at 394. Denying PVV the opportunity to stage and carry out its proposed gatherings on equal terms as the social justice protests the City has allowed and encouraged is arguably impermissible viewpoint discrimination under the First Amendment. *See, e.g.*, *Capitol Hill*, 2020

---

[16] *See* "Mayor Kenney waives code violation notices for recent Philly protests," at https://whyy.org/articles/mayor-kenney-waives-code-violation-notices-for-recent-philly-protests/ (emphasis added).

WL 5995126, at *8 ("[H]igh-profile government officials encouraging and participating in protests 'sent a clear message that mass protests are deserving of preferential treatment.'") (quoting *Soos*, 2020 WL 3488742, at *12)). To say that parade organizers and others seeking to engage in group expressive activity can do what social justice protesters did over the summer and hold their events without permits is no response. There is no reason to believe that the Mayor will necessarily praise their speech as he did the speech of recent protesters, suspend code violations, and otherwise permit them to engage in their expression in the same way those praised by the Mayor have been able.

If viewpoint discrimination is found on the record in this case, then that action must meet the demanding standard of being justified by a compelling interest pursued through the least restrictive means. That would be a very difficult showing. The City would have to show that its interest in prohibiting the PVV's and third parties' proposed expressive activity, while allowing (and encouraging) even larger gatherings for protests, furthers a compelling interest and is narrowly tailored to address that interest. *See Butler*, 2020 WL 5510690, at *15 (invaliding certain COVID-19 limitations implicating the First Amendment as "not narrowly tailored"). As another district court held recently, with respect to COVID-19 limitations on religious worship, "the District's (and in particular, [the Mayor's]) support for at least some mass gatherings undermines its contention that it has a compelling interest" in its regulation. *Capitol Hill Baptist Church*, 2020 WL 5995126, at *8; *see also id.* (explaining that the District of Columbia's "apparent encouragement of these protests also implies that the District favors some gatherings (protests) over others (religious services)."). The City would also need to somehow rebut the contention made by other municipalities that physical movement – which occurs both in a parade

and a political protest – actually reduces the risk of the spread of COVID-19. *Capitol Hill Baptist Church*, 2020 WL 5995126, at *9.

### C. The City's Event Moratorium is Not a Legitimate Time, Place, and Manner Regulation.

The City may try to claim that its Event Moratorium is a viewpoint and content-neutral regulation, but even if true, it is not a legitimate time, place, and manner regulation. "To ascertain what limits, if any, may be placed on protected speech, [the Supreme Court] ha[s] often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ." *Frisby* v. *Schultz*, 487 U.S. 474, 479 (1988). Traditional public forums, such as streets and parks, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague* v. *CIO*, 307 U.S. 496, 515 (1939)). In such forums, content-based regulations must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end," while content-neutral regulations of the "time, place, and manner of expression" must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

Accordingly, even if the City claims that its ban is a content-neutral time, place, and manner regulation, such a regulation would still be subject to intermediate scrutiny. Although no one disputes that slowing the spread of COVID-19 is a "significant governmental interest," *McCullen* v. *Coakley*, 573 U.S. 464, 477 (2014) (citation omitted), to survive First Amendment scrutiny as a time, place, and manner regulation, the City's ban would need to be narrowly

tailored to serve that interest and leave open ample alternative channels for plaintiff's speech. *United States* v. *Grace*, 461 U.S. 171, 177 (1983).

The "narrowly tailored" standard, while not requiring a regulation to be the least restrictive or least intrusive means of promoting the asserted interest, still requires a "reasonable fit between [the government's] legitimate interests" and "the means chosen to serve those interests." *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 416 (1993); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 799 (1989) (the rejection of the least restrictive means test for time, place or manner regulations "does not mean that a . . . regulation may burden substantially more speech than is necessary to further the government's legitimate interests"). As the Third Circuit has explained: "[w]hile the requirement of narrow tailoring does not mean that the ordinance must be the least restrictive means of serving the Borough's substantial interests, [g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Phillips v. Borough of Keyport,* 107 F.3d 164, 174 (3d Cir. 1997) (quotation omitted); *see also U.S. Sound & Service, Inc. v. Tp. of Brick,* 126 F.3d 555, 558–59 (3d Cir. 1997).

The City's ban is not a reasonable fit for its health and safety goals. The ban excessively and improperly burdens the PVV's contemplated speech and assembly, as well as the speech of *any* citizens who seek a permit, when compared to individuals or groups who do not apply for a permit. The City has stated that it will not enforce any safety measures on the gathering of large groups if such groups demonstrate or assemble without a permit.[17] But the City has not offered

---

[17] *See* Mayor's Press Conference, https://www.youtube.com/watch?v=6vtzHF-KwTQ&list=PLjOjrf1VwmXfmqIGbTZF69BnclnljP28u&index=68&t=0s.

any plausible explanation as to how large demonstrations that have taken place without a permit are somehow safe, while those that seek a permit are forbidden on supposed public safety grounds. Similarly, as noted, the City now allows gatherings of up to 7,500 people in outdoor venues, relying on evidence that the virus does not spread as easily outside as it does indoors. While this rationale applies equally to outdoor parades, the City has not lifted the Event Moratorium. Nor has it even attempted to explain the rationale for treating sports fans one way, but those seeking a permit for constitutionally protected activity another way.

This disparate treatment (and obvious double standard) unfairly punishes the First Amendment rights of PVV and permit-seeking groups – those that seek the assurance *ex ante* that their actions are lawful and that wish to hold gatherings that require coordination with the City – while allowing non-permitted groups to exercise their First Amendment rights, notwithstanding the City's supposed concern for COVID-19 safety. A key constitutional inquiry is often whether the government is treating like behavior alike. The government cannot subject protected activity to restrictions that are "more severe" than the "restrictions [that] apply to comparable" non-protected activity, or draw artificial distinctions within such protected activity. *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of injunctive relief).

The City's distinction between the two types of events that are essentially identical, except that the organizers of one pursued a permit while the organizers of the other did not, bears *no* relation to the City's interest in limiting the transmission of COVID-19. If anything, organizers like the PVV who try to follow the City's rules and obtain a permit would be *more* likely to follow the City's safety requirements during their protected activity. The Supreme Court

has often struck down ordinances where the distinction between two types of speech or expression is unrelated, or only tangentially related, to the interest asserted by the government. *E.g., Discovery Network,* 507 U.S. at 424 ("[n]ot only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship whatsoever to the particular interests that the city has asserted"); *Carey v. Brown,* 447 U.S. 455, 465 (1980) (statute permitting labor picketing but not non-labor picketing could not be sustained when "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on [the Government's asserted interest of] privacy"); *Village of Schaumberg v. Citizens for a Better Env't,* 444 U.S. 620, 636 (1980) (requirement that charitable solicitors use seventy-five percent of funds collected for charitable purposes only "peripherally promoted" the city's interest in "protecting the public from fraud, crime and undue annoyance"). The City's ban should suffer the same fate.

In addition, the City makes no allowance for other measures that could satisfy its interest in combatting COVID-19, and still permit the exercise of the right to assembly and free speech. Thus, there is no provision in the City's ban to consider, *e.g.*, adherence to social distancing, masking, or other CDC guidelines. For this reason, too, the Event Moratorium is not narrowly tailored. Rather, the City has taken the easy – and unconstitutional – way out by simply banning speech altogether.

Furthermore, the City's suggestion that PVV might roll the dice and gather without a permit because the City and police have not been forcibly dispersing peaceful gatherings, PVV Compl. at ¶¶ 41-46, does not change the fact that the City still treats such speech worse than protests by refusing to undertake the associated up-front coordination with the PVV to protect

parade participants from traffic. PVV wants to follow the law and obtain a permit, even though theoretically it could be deceptive and have its members and supporters show up simultaneously for an impromptu "protest" parade. The solution is to enjoin the Event Moratorium, not to encourage people to flout it. By contrast, the City has routinely undertaken protective steps for protestors – but refuses to do so for parade organizers. Moreover, the City's response ignores the impermissible chilling effect that the ban has on PVV and others' First Amendment protected activities, as their conduct would still be considered unlawful. As a practical matter, it would make no sense for parade organizers to plunge forward without a permit and risk legal liability (not to mention public criticism). It is both unfair and unconstitutional to deny the planners of parades the same deployment of municipal resources – for example, traffic control and police presence – that recent protests have enjoyed.

The City's suggestion that it will not use law enforcement to disperse gatherings, PVV Compl. ¶ 53, does not help the Event Moratorium pass constitutional muster. Rather, the City's representations that it will not stringently apply its own policy "is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

In *Butler v. Wolf*, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020), applying the time, place, and manner framework, the district court recently struck down a statewide ban on large gatherings in Pennsylvania. It held that the numerical restrictions for indoor and outdoor gatherings, encompassing all First Amendment activity, were not narrowly tailored and "placed substantially more burdens on gathering than needed to achieve their stated purpose." *Id.* at *15. There, the court also noted that commercial activity was treated more favorably than "political,

social, cultural, educational and other expressive gatherings" that should receive greater protection. *Id.* Here, the case is even stronger, as the City allows some First Amendment activity but not others – and in a way that is completely unrelated to its public safety interest.

A permissible time, place, and manner regulation must also "leave open ample alternative channels of communication." *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (citations omitted). "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *Members of City Council of City of L.A.* v. *Taxpayers for Vincent*, 466 U.S. 789, 812 (1984) (internal citation omitted). Here, the PVV wishes to celebrate and commemorate the shared sacrifice of its members who served during the Vietnam War. By actually following the City's announced policy instead of taking the law into its own hands, its members are restricted from doing so while protestors or assemblies who do not seek a permit are allowed to congregate on Philadelphia's streets without any limits whatsoever. Again, the answer to this blatant contradiction is not to restrict protest activity. Rather, it is to invalidate the City's unconstitutional ban and allow the PVV and other groups the same opportunity to express their views.

**IV.    CONCLUSION**

Based on the allegations in the Complaint, the City's policy is unconstitutional. The

policy prohibits a myriad of protected public gatherings, while simultaneously allowing the

speech/assembly of groups of any size if they take to the streets to demonstrate without a permit

and without any public health precautions at all. This differential treatment bears no relationship

to the City's COVID-related public safety interest. The First Amendment simply does not allow

this. Rather, it protects peaceful public speech – whether in an expressive parade or political

protest – regardless of the views expressed.

The United States respectfully submits that the Court consider the above arguments in

deciding whether the Event Moratorium violates the Constitution.


Respectfully submitted,

ERIC S. DREIBAND                              /s/William M. McSwain
Assistant Attorney General                    WILLIAM M. MCSWAIN
                                              United States Attorney
JOHN B. DAUKAS
Principal Deputy Assistant Attorney General   GREGORY B. DAVID
                                              Assistant United States Attorney
ALEXANDER V. MAUGERI                          Chief, Civil Division
Deputy Assistant Attorney General
U.S. Department of Justice                    ERIC D. GILL
Civil Rights Division                         JACQUELINE C. ROMERO
950 Pennsylvania Ave, NW                      Assistant United States Attorneys
Washington, DC 20530                          Eastern District of Pennsylvania
                                              615 Chestnut St., Suite 1250
                                              Philadelphia, PA 19106-4476
                                              (215) 861-8200

                                              *Counsel for the United States*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 30, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

CM/ECF users associated with this case.

/s/ Eric D. Gill
*Assistant U.S. Attorney*